Scott P. Shaw, State Bar No. 223592
 Sshaw@calljensen.com
Samuel G. Brooks, State Bar No. 272107
 Sbrooks@calljensen.com
CALL & JENSEN
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
Tel:   (949) 717-3000
Fax:   (949) 717-3100

Attorneys for Defendant Nordstrom, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAGTRENDS, INC., a California Corporation; TAGTRENDS ASIA, a Hong Kong corporation; and ROBERT MICHAEL HAROUTOONIAN aka ROB HART, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> NORDSTROM, INC., a Washington corporation; and DOES 1 through 10 inclusive, <br><br> Defendants. | Case No.  SACV13-563-JVS (JPRx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** <br><br> Date:  July 14, 2014 <br> Time:  1:30 pm <br> Place: Courtroom 10C <br><br> Complaint Filed:   April 9, 2013 <br> Trial Date:        None Set |

CALL & JENSEN

NOR04-12:1332581_7:6-16-14

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................... 4

    A.   Plaintiffs Failed Completely In Their Disclosure/Discovery
        Obligations ........................................................................................ 4

    B.   The History Of tagTrends, tagTrends Global And TT Global ........... 5

    C.   Nordstrom's Relationship With tagTrends And TT Global ............... 6

    D.   Nordstrom's Internal Use and Non-Commercial Supplier
        Website .............................................................................................. 7

    E.   Nordstrom Changed Its Supplier Website Promptly After
        Being Notified About The *Alleged* Error At Issue ......................... 8

III. LEGAL STANDARD .............................................................................. 9

IV.  ARGUMENT ........................................................................................... 9

    A.   Plaintiffs' Failure To Provide Any Damages Evidence
        Warrants Entry Of Judgment As To Plaintiffs' Claims For
        Trademark Infringement, Unfair Competition, And False
        Advertising ........................................................................................ 9

        1.   Injunctive relief is moot .......................................................... 10

        2.   Plaintiffs disclosed no evidence of damage ........................... 10

        3.   Plaintiffs cannot recover profits ............................................. 15

        4.   Plaintiffs have no evidence of actual damages
            resulting from Nordstrom's conduct ....................................... 16

    B.   There Is No Likelihood of Confusion ............................................. 17

    C.   Plaintiffs Fail To State Any Claim Under The Lanham Act,
        Because Nordstrom's Website Identifying TT Global As
        "Formerly tagTrends" Is Not A "Use In Commerce," And
        Even If It *Could Be* A "Use In Commerce" There Is No
        Admissible Evidence Of Likelihood Of Confusion. ...................... 20

    D.   Plaintiffs Fail To State A Claim For Violation Of
        California's False Advertising Law ................................................. 22

1

**TABLE OF CONTENTS(con't)**

2

Page

3

E.    Plaintiffs State No Claim For Conspiracy Or Aiding And
Abetting ...................................................................................... 24

4

5

1.    Aiding and Abetting (Claims 6 and 7) ............................... 24

6

2.    Civil Conspiracy ............................................................... 25

7

V.    Conclusion ............................................................................................ 25

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*AMF Inc. v. Sleekcraft Boats,*

    599 F. 2d 341 (9th Cir. 1979) ...................................................................................18

*Anderson v. Liberty Lobby, Inc.,*

    477 U.S. 242 (1986) ...................................................................................................9

*Blau v. YMI Jeanswear, Inc.,*

    2004 WL 5313967 (C.D. Cal. 2004) ...............................................10, 11, 15, 16, 17

*Bosley Med. Inst., Inc. v. Kremer,*

    403 F. 3d 672 (9th Cir. 2005) ..................................................................................21

*Celotex Corp. v. Catrett,*

    477 U.S. 317 (1986) ...................................................................................................9

*Century 21 Real Estate Corp. v. Sandlin,*

    846 F. 2d 1175 (9th Cir. 1988) ................................................................................21

*eBay Inc. v. MercExchange, LLC,*

    547 U.S. 388 (2006) .................................................................................................19

*Finley v. Marathon Oil Co.,*

    75 F.3d 1225 (7th Cir. 1996) ...................................................................................11

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,*

    240 U.S. 251 (1916) .................................................................................................16

*Hancock Park Homeowners Ass'n Est. 1948 v. Hancock Park Home*

    *Owners Ass'n,* 2006 WL 4532986 at *4 (C.D. Cal. 2006) ......................................21

*Harper House, Inc. v. Thomas Nelson, Inc.,*

    889 F.2d 197 (9th Cir. 1989) ...................................................................................16

*Hawkins v. Barney's Lessee,*

    30 U.S. 457 (1831) ...................................................................................................11

NOR04-12:1332581_7:6-16-14      - iii -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

CALL &
JENSEN

# TABLE OF AUTHORITIES (con't)

Page

*Hoffman v. Construction Protective Services, Inc.*,
  541 F.3d 1175 (9th Cir. 2008) ...................................................................11

*In re Circuit Breaker Litig.*,
  860 F.Supp. 1453 (C.D.Cal. 1994) ..........................................................10

*J&J Celcom v. AT&T Wireless Servs.*,
  215 Fed. Appx. 616 (9th Cir. 2006) ..........................................................11

*Jada Toys, Inc. v. Mattel, Inc.*,
  518 F.3d 628 (9th Cir. 1988) ....................................................................18

*Kassbaum v. Steppenwolf*,
  236 F.3d 487 (9th Cir. 2000) ..............................................................19, 20

Kingsmen v. K-Tel Int'l Ltd.,
  557 F.Supp. 178 (S.D.N.Y. 1983) ............................................................20

*Lindy Pen Co., Inc.*,
  982 F.2d at 1407 .......................................................................................16

*Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...................................................................................9

*Playboy Enterprises, Inc. v. Welles*,
  7 F.Supp.2d 1098 (S.D.Cal. 1998) ...........................................................20

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*,
  926 F.2d 134 (2d Cir. 1991) .....................................................................16

*Robert Stigwood Group, Ltd. v. Hurwitz*,
  462 F.2d 910 (2d Cir. 1972) .....................................................................10

*Rodeo Collection Ltd. v. West Seventh*,
  812 F.2d 1215 (9th Cir. 1987) ..................................................................19

Rolex Watch, U.S.A., Inc., v. Michel Co.,
  179 F.3d 704 (9th Cir.1999) ......................................................................15

CALL&
JENSEN

# TABLE OF AUTHORITIES (con't)

Page

*Schiller v. City of New York*, No. 04-Civ.-7921,

    2007 U.S. Dist. LEXIS 16935 (S.D.N.Y. 2007) ........................................................11

*Spina v. Forest Pres.*, No. 98-C-1393,

    2001 U.S.  Dist. LEXIS 19146 (N.D. Ill. 2001)........................................................11

*Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*,

    769 F.2d 1393 (9th Cir.1985) ........................................................22

*Toho Co., Ltd. V. William Morrow & Co., Inc.*, F.Supp.2d 1206, 1210

    (C.D.Cal. 1998) ........................................................22

*United States v. Dunn*, No. 04-C-50472,

    2007 U.S. Dist. LEXIS 27089 (N.D. Ill. Apr. 12, 2007)........................................................11

## STATE CASES

Casey v. U.S. Bank Nat'l Ass'n,

    127 Cal. App.4th 1138 (2005) ........................................................24

*Kasky v. Nike, Inc.*,

    27 Cal.4th 939 (Cal. 2002) ........................................................23

*Mosier v. S. Cal. Physicians Ins. Exch.*,

    63 Cal. App. 4th 1022 (1998)........................................................25

## FEDERAL STATUTES

15 U.S.C. § 1125(a)(1)........................................................17

35 U.S.C. §1125(a) (Section 43(a)........................................................9

## STATE STATUTES

California Business & Professions Code §17500 ........................................................22

## FEDERAL RULES

Fed. R. Civ. P. 26 ........................................................11, 12, 14, 15

Fed. R. Civ. P. 26(a)(1)(A)(i)........................................................12

Fed. R. Civ. P. 26(a)(1)(A)(iii) ........................................................11

NOR04-12:1332581_7:6-16-14      - v -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

# TABLE OF AUTHORITIES (con't)

Page

Fed. R. Civ. P. 56(a) .......................................................................................... 9

## OTHER AUTHORITIES

4 McCarthy on Trademarks and Unfair Competition § 23:101 (4th ed.) ...................... 18

# I.     INTRODUCTION

To Defendant's and its counsel's knowledge, this is the first trademark case in U.S. history filed by a supplier against its former customer for *customer* confusion.  It makes no sense.  It is probably the most bizarre trademark case ever filed.  *Who is confused about what?*  Defendant Nordstrom is still confused as to how Plaintiffs could believe that Nordstrom—an innocent victim and former customer of Plaintiffs—could or would do anything that could possibly result in customer confusion.

As background, the Plaintiffs are suppliers for labels and tags that are placed on private label Nordstrom clothing it purchases from its overseas manufacturers.  It is undisputed that Nordstrom is not accused of using Plaintiffs' trademark in connection with any offering of goods or services to the public or to customers visiting Nordstorm's stores or website; which is of course what plaintiffs typically allege in trademark cases, and is what the Lanham Act is concerned with—*i.e.,* protection of the purchasing public from mistakenly purchasing a defendant's goods/services.  Rather, here, *Nordstrom is the purchaser*.  Nordstrom purchases finished clothing products for its own brands from its manufacturers, and Nordstrom directs those manufacturers to purchase labels and tags from specific pre-approved Nordstrom tag suppliers.  Nordstrom controls the entire process for its private label clothing products; manufacturers have no choice in the decision of which tag supplier to use; Nordstrom previously makes that decision when it pre-approves the tag supplier.  Thus, no customer purchasing decision is present in this case (*i.e.,* there is no concern that one customer visits Nordstrom's website and mistakenly decides to engage in a transaction with the wrong company).[1]  Therefore, even assuming Nordstrom wrongly identified

---

[1] Also, typically a plaintiff in a trademark case will submit a consumer survey to prove likelihood of confusion.  However, in this case a survey would not make any sense because there is no "purchasing public." Here, Plaintiffs did not and could not have obtain an expert survey report, because there would be no relevant "consumers" to test, which further supports why Plaintiffs cannot pursue a Lanham Act claim.

Plaintiffs' former ally/current competitor, TT Global, as "formerly tagTrends," there is no risk of "customer" confusion because *Nordstrom is the only customer*.

Plaintiffs are former label and tag suppliers of Nordstrom.   Plaintiffs lost Nordstrom as a customer after Plaintiffs parted ways with former business partner, tagTrends Global (now known as TT Global).   Plaintiff Rob Hart ("Hart") has accused his former partner, Pui Fung Chan (a/k/a Joe Chan), of stealing his business, and Plaintiffs are using this action as a means to intimidate Nordstrom in the hopes that Nordstrom will cease doing business with Chan's company, TT Global.   In this effort to exact retribution, Plaintiffs have concocted various claims for money damages, which all hinge on the bizarre allegation that Nordstrom caused "customer" confusion by referring to TT Global as "formerly TagTrends" on Nordstrom's supplier website.   If anything, it was *Nordstrom* who suffered "customer" confusion created by Hart and Chan in their dispute with each other.   Nordstrom was the customer.   It made no money from its supplier website, and Nordstrom has no interest in getting caught-up in a dispute between two former business partners.

Plaintiffs' claims against Nordstrom are built solely on speculation—not evidence.   Although Plaintiffs' damage(s) theory is dubious, Plaintiffs seem to argue that Nordstrom's website might have caused confusion to *third party customers*.   Even if this theory had any legal merit (which it does not as explained below), Plaintiffs have not identified a single third party customer of Plaintiffs who visited Nordstrom's website and was confused by Nordstrom's conduct.   Plaintiffs' customers have no reason to visit Nordstrom's website; they are not consumers of Nordstrom's private label goods.   Rule 26 requires Plaintiffs to disclose witnesses with knowledge to support Plaintiffs' claims, documents to support the claims, and a computation of each category of Plaintiffs' damages.   Plaintiffs represented in disclosures that third parties would be disclosed, but after the entire discovery period, and after multiple requests from Nordstrom, Plaintiffs have still not disclosed any such evidence.   Instead, Plaintiffs continue to represent that no evidence exists *yet* . . ., but that Plaintiffs will

CALL&
JENSEN

produce the evidence when it becomes available from a related ongoing State Court action between TT Global and tagTrends (*Pui Fung Chan aka Joe Chan v. Robert Michael Haroutoonian aka Robert Hart, et al.*, Case No. 30-2012 00582125). Unfortunately for Plaintiffs, Nordstrom is not required to wait for evidence to *become available* (if ever) in another pending lawsuit.  It is clear and undisputed that, at this point, Plaintiffs have not submitted any evidence to support their speculative theory that a statement buried in an internal Nordstrom website caused any third party customer confusion.  And because Nordstrom immediately removed the accused language from the supplier website upon Plaintiffs request, any claim for equitable relief is moot. Plaintiffs cannot seek to hold Nordstrom hostage without any evidence of damage.

As with the damage claim(s), Plaintiffs' liability argument is not based on admissible evidence or any viable legal rationale.  If Plaintiffs intended to pursue this dubious theory and create new trademark law, Plaintiffs were required, at a bare minimum, to produce admissible evidence during the discovery phase that their customers (i) navigated to Nordstrom's internal supplier website and saw the statement "TT Global (formerly TagTrends)," (ii) concluded solely from that statement that TT Global was affiliated with Plaintiffs, and (iii) that these customers did nothing to investigate the statement on the website.  Then, in order to recover monetary relief, Plaintiffs would have to prove that these same third parties, after making their own independent inquiry as to whether TT Global really was formerly TagTrends, diverted their business from Plaintiffs to TT Global based solely only on the statement on Nordstrom's website.  Indeed, Plaintiffs' Rule 26 disclosures stated that they would *attempt* to prove their theory through evidence from third parties, documents obtained from Nordstrom, and the related State Court action.  Unfortunately, Plaintiffs did nothing during the discovery period to support their claims (*e.g.,* no depositions of third parties, no deposition of Nordstrom, and no documents from the related State Court action).  Thus, according to Plaintiffs' own admissions in their Rule 26 disclosures, they do not possess sufficient evidence at this time to prove their claims.

CALL& JENSEN

Plaintiffs' back-up claims for false advertising, aiding and abetting Chan, and conspiring with Chan, are likewise specious. Plaintiffs have not disclosed any evidence to support any of these claims, even after completing fact and expert discovery. This Court previously dismissed Plaintiffs' conspiracy theory claims on the pleadings. While Plaintiffs amended to allege a few more facts, they still have no evidence to support these claims. Plaintiffs' unsupported speculations and allegations are not sufficient to withstand summary judgment.

## II.   FACTUAL BACKGROUND[2]

### A.   Plaintiffs Failed Completely In Their Disclosure/Discovery Obligations

Discovery in this case began on July 15, 2013, after the parties' counsel held their Rule 26(f) conference. [Declaration of Scott P. Shaw ("Shaw Dec.") ¶ 2]. Yet after almost a year, Plaintiffs have still not disclosed any evidence to support their claims. In fact, on May 19, 2014—the date of the discovery cut-off—Plaintiffs served defective supplemental disclosures, which re-confirmed Plaintiffs initial disclosures that they could not identify any evidence of customer confusion (*e.g.*, not a single witness was identified to testify regarding customer confusion), and which admitted that Plaintiffs still cannot provide a computation of any category of damages (*e.g.*, representing that the "[d]ocuments provided by Defendant to date are insufficient to enable these Plaintiffs to itemize their damages."). [Statement of Uncontroverted Facts ("SUF") Nos. 39-40].

Nordstrom requested the facts supporting Plaintiffs' claims through interrogatories, yet Plaintiffs' responses reveal no viable theory of recovery. When asked to compute their damages, Plaintiffs have repeatedly responded throughout the discovery period that they are unable to do so. [SUF No. 40 (*e.g.*, Shaw Dec., ¶ 2, ¶ 5, Exh. 4, ¶ 6, Exh. 5, and 10-11, Exhs. 15-16]. Plaintiffs have not disclosed any expert

---

[2] The Factual Background section of this memorandum includes facts that are relevant for context, but which are not necessarily material facts for purposes of summary judgment. All citations to material uncontroverted facts are to the Statement of Uncontroverted Facts filed concurrently with this memorandum.

NOR04-12:1332581_7:6-16-14                          - 4 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

CALL & JENSEN

reports, such as survey evidence, which could potentially establish a likelihood of confusion or support a damages theory. Plaintiffs have offered no evidence of actual confusion, notwithstanding interrogatories seeking that information. [SUF No. 40]. Plaintiffs have failed to explain any damages theory in their interrogatory responses or Rule 26 disclosures. Plaintiffs have also failed to present any evidence of actual injury. [SUF Nos. 4-6, 22-30, 32-33, and 37-40].

### B.   The History Of tagTrends, tagTrends Global And TT Global

According to Plaintiffs' Amended Complaint, Hart started a business called tagTrends, Inc. ("tagTrends") in California in 2003. (Amended Complaint, ¶13). At around the same time, Hart started a related business with Chan called tagTrends Asia in Hong Kong. Chan was a ten percent owner of tagTrends Asia. Customers of tagTrends, Inc. and tagTrends Asia were sophisticated and well established players in the apparel manufacturing industry, including well-known companies such as Abercrombie & Fitch, Quiksilver, Seven Jeans, Roxy, VF Corp, DC Shoes, Adriano Goldschmied, Under Armour, Burton and Oakley. (Amended Complaint, ¶16). In 2007, Nordstrom became one of those customers.

However, in 2008, Rob Hart's financial hardships led to cash flow problems for tagTrends Asia. Hart suggested to Chan that they establish a "transition plan" in case he had a nervous breakdown, and Chan thereafter started a new company called tagTrends Global. With Rob Hart's full knowledge, tagTrends Global began accepting orders in place of tagTrends Asia.

Hart knew that tagTrends Global would start taking and fulfilling orders instead of tagTrends Asia. On March 21, 2009, Joe Chan notified Rob Hart by email that he "will start to let customers know they should place order[s] to tagTrends Global next week." Hart was well aware of the operations of tagTrends Global. He regularly corresponded with employees who had @tagtrendsglobal.com email addresses, and who had tagTrends Global signature blocks. He also participated in transferring a lease from tagTrends Asia to tagTrends Global. Stated simply, Rob Hart was fully aware of



CALL & JENSEN

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

the formation of tagTrends Global in April 2009, and he endorsed the transition of business from tagTrends Asia to tagTrends Global.

At some point, Rob Hart came to believe that he had been cheated by Joe Chan. In December 2010, Chan notified Hart that he would change the name of tagTrends Global to TT Global in order to eliminate any confusion between the companies.  Only then, after twenty months of operation by tagTrends Global did Hart accuse Chan of stealing his business.

In the meantime, TT Global and its employees continued to conduct their business with customers, including Nordstrom. Rob Hart did not notify Nordstrom of his dispute with Chan until June 2012—a year and a half later—when Hart's attorney sent Nordstrom a letter vaguely demanding that Nordstrom not aid and abet TT Global in some nebulous plot to steal tagTrends' business.  [SUF Nos. 25-30].

## C.    Nordstrom's Relationship With tagTrends And TT Global

Nordstrom is a leading high-end department store. [SUF No. 1].  As part of its retail operations, Nordstrom sells clothing manufactured under its own brands. [SUF No. 2].  Nordstrom-branded products are manufactured by third party suppliers. [SUF No. 3].  Part of the process of getting products to retail involves creating and attaching hangtags and labels to the product. [SUF No. 4].  Nordstrom controls the supply chain by directing its manufacturers to secure tags and labels from approved product label, hangtag, and packaging suppliers. [SUF No. 5].

In or around 2007 Nordstrom approved tagTrends as a hangtag and label supplier for its private brands. [SUF No. 7].  As the customer, Nordstrom thereafter began directing its manufacturers to obtain hangtags and labels from tagTrends, Inc. and tagTrends Asia. [SUF No. 7].  In April 2009, Nordstrom was notified that future orders should be placed through tagTrends Global rather than tagTrends Asia. [SUF No. 8]. However, Nordstrom continued to communicate with the same individuals who had represented tagTrends Asia, including Robert Redding and Michelle Lam. [SUF No. 9]. Nordstrom reasonably concluded that tagTrends Global was affiliated with tagTrends

Asia. [SUF No. 10].  In fact, after tagTrends Global was created, Nordstrom employees continued to refer to tagTrends Global merely as "tagTrends." [SUF No. 11].

Around 2011, Nordstrom was notified that tagTrends Global changed its name to TT Global. [SUF No. 12].  As before, Nordstrom employees continued to communicate with the same people, and experienced no change in service. [SUF No. 13].

### D.    Nordstrom's Internal Use and Non-Commercial Supplier Website

Nordstrom maintains a website for suppliers at www.nordstromsupplier.com. [SUF No. 16].  This website in turn has a link for the "NPG Supplier Procedures Manual," which directs the user to www.nordstromsupplier.com/NPG/index.htm. [SUF No. 17].  "NPG" stands for "Nordstrom Product Group," the division of Nordstrom which produces products under Nordstrom's private labels. [SUF No. 18].  From the "NPG Supplier Procedures Manual" page, a user can then navigate to a link for "Product Label, Hangtag, and Packaging Suppliers." [SUF No. 19].  The link directs the user to www.nordstromsupplier.com/NPG/productlabel.html. [SUF No. 20].  That page includes a list of approved product label, hangtag, and packaging suppliers. [SUF No. 21].

Nordstrom directs each of its manufacturers to order labels, hangtags, and packaging supplies from a particular supplier that Nordstrom has pre-selected. [SUF No. 22].  The NPG Supplier Procedures Manual website is specifically designed for internal use by Nordstrom employees and Nordstrom partners who manufacture goods for the Nordstrom Product Group. [SUF No. 23].  Because tagTrends was an approved product label, hangtag, and packaging supplier, it was included on the list at www.nordstromsupplier.com/NPG/productlabel.html.   In 2011, after learning that tagTrends Global had changed its name to TT Global, Nordstrom updated its supplier website from "TagTrends" to "TT Global (formerly tagTrends)." [SUF No. 14]. Because TT Global had been formerly known as tagTrends Global, at the time Nordstrom updated the website it had every reason to believe that identifying TT Global as "formerly tagTrends" was accurate. [SUF No. 15].



MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

**E.    Nordstrom Changed Its Supplier Website Promptly After Being Notified About The *Alleged* Error At Issue**

After accusing Joe Chan of stealing his business, Rob Hart discovered the "formerly tagTrends" language on the Nordstrom supplier website in or around April 2012. [SUF No. 24].  In June, 2012, Plaintiffs' then-attorney, Stephen W. Berger, sent a letter to Nordstrom's president, Blake Nordstrom, which alleged that TT Global, Robert Redding, and Pui Fung Chan were falsely claiming "that they are an extension of, a successor to, and/or a continuation of . . . tagTrends." [SUF No. 25].  The letter stated that TT Global, Redding, and Chan had misappropriated tagTrends' trade secrets, and notified Nordstrom that tagTrends was prosecuting a lawsuit against TT Global, Robert Redding, Vicki Redding, and Chan in Hong Kong, and planned to commence a lawsuit in the United States. [SUF No. 26].   The letter requests that Nordstrom "please immediately cease and desist from actually doing or even appearing to do anything to aid and abet Global, Redding, and Chan in their misconduct and wrongdoing against tagTrends." [SUF No. 27].  And it threatens that if Nordstrom fails to comply with this demand, "tagTrends will have no choice but to proceed as appropriate to fully protect its rights and interests." [SUF No. 28].

Mr. Berger's letter, however, made no mention of exactly how Nordstrom was alleged to be aiding and abetting TT Global, Redding, or Chan, did not explain what he expected Nordstrom to do, and did not say what tagTrends intended to do should Nordstrom fail to cooperate. [SUF No. 29].  The letter contains no reference whatsoever to any language on Nordstrom's supplier website, even though Plaintiffs admit they had actual knowledge of the supplier website at the time the letter was sent.  [SUF No. 30].

Nearly a year later, in April 2013, Plaintiffs filed a Complaint against Nordstrom in this matter. [SUF No. 31].  For the first time, Nordstrom learned that Plaintiffs considered the language on its website identifying TT Global as "formerly tagTrends" to constitute trademark infringement and unfair competition. [SUF No. 32].  Nordstrom had no vested interest in the dispute, and promptly changed its website to remove the



CALL & JENSEN

"formerly tagTrends" language on April 17, 2013. [SUF No. 33]. Nordstrom's website continues to identify "TT Global" as an approved product label, hangtag, and packaging supplier for Nordstrom Product Group products. [SUF No. 34]. And Nordstrom continues to refer manufacturers of its private label products to TT Global for labels, hangtags, and packaging. [SUF No. 35].

## III.   LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, when addressing a motion for summary judgment, the Court must decide whether there exists "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of the other party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial, which it can meet by presenting evidence establishing the absence of a genuine issue or by "pointing out to the district court … that there is **an absence of evidence**" supporting a fact for which the nonmoving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (emphasis added). To defeat summary judgment, the nonmoving party must put forth "affirmative evidence" that shows "that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256-57. This evidence must be admissible. Fed. R. Civ. PO. 56(c), (e). The nonmoving party cannot prevail by "simply showing that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.   ARGUMENT

### A.   Plaintiffs' Failure To Provide Any Damages Evidence Warrants Entry Of Judgment As To Plaintiffs' Claims For Trademark Infringement, Unfair Competition, And False Advertising

Plaintiffs' trademark/unfair competition claims are based on alleged violations of 35 U.S.C. §1125(a) (Section 43(a) of the Lanham Act). (Amended Complaint, Claims

for Relief Nos. 1-4). Because Nordstrom removed the accused statement from its supplier website, injunctive relief is moot. And Plaintiffs have no evidence to support a claim for monetary relief. Even if Plaintiffs could prevail on some obscure liability theory, Nordstrom earned no unjust profits, and Plaintiffs suffered no actual injury due to Nordstrom's conduct. Because Plaintiffs are not legally entitled to any remedies, Nordstrom is entitled to summary judgment. *See Blau v. YMI Jeanswear, Inc.*, 2004 WL 5313967 (C.D. Cal. 2004) (granting summary judgment in a trademark and unfair competition case where injunctive relief was moot, and the Plaintiff failed to produce evidence of damages); *affirmed by Blau v. YMI Jeanswear, Inc.*, 2005 WL 957363 (9th Cir. 2005). In granting summary judgment in *Blau*, as the Court should do in this case, the district court found that "[n]either Plaintiff nor Koral, testifying as to their lay opinions, could identify specific accounts or customers that were lost due to Defendants' alleged infringement of Plaintiff's mark." *Blau*, WL 5313967 at *4.

### 1.    Injunctive relief is moot

The only fact alleged by Plaintiffs in support of their trademark and unfair competition claims is that Nordstrom's supplier website once identified "TT Global (formerly tagTrends)" as an approved product label, hangtag, and packaging supplier. Nordstrom removed the parenthetical on April 17, 2013, and it does not intend to refer to TT Global as tagTrends on any of its websites in the future. [SUF Nos. 34, 36]. Accordingly, injunctive relief is moot. *See e.g. Robert Stigwood Group, Ltd. v. Hurwitz*, 462 F.2d 910, 913 (2d Cir. 1972) (no injunction unless there is "cognizable danger of recurrent violation, something more than the mere possibility"); *In re Circuit Breaker Litig.*, 860 F.Supp. 1453, 1456 (C.D.Cal. 1994) (no injunction where "defendant infringed innocently, ceased before judgment and assured the court that it has no intention of infringing in the future").

### 2.    Plaintiffs disclosed no evidence of damage

Because injunctive relief is moot, Plaintiffs can only obtain a remedy if they can prove some form of monetary recovery. It is axiomatic that there is "no right without a

CALL&
JENSEN

remedy." *See Hawkins v. Barney's Lessee*, 30 U.S. 457, 463 (1831).   Therefore, if Plaintiffs cannot prove that they are entitled to monetary recovery, a trial on liability would be pointless, and summary judgment is appropriate. *Blau*, WL 5313967.

Plaintiffs have admitted in their correspondence, discovery responses, and their disclosures that they cannot prove any damages. [SUF No. 40]. Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure requires parties, "without awaiting a discovery request, [to] provide to the other parties: . . . a computation of each category of damages claimed by the disclosing party," as well as the evidence on which each computation is based.  The failure to timely disclose, without justification, is grounds for exclusion. *See Hoffman v. Construction Protective Services, Inc.*, 541 F.3d 1175, 1179-1180 (9th Cir. 2008) (undisclosed evidence of damages precluded for failure to comply with Rule 26); *J&J Celcom v. AT&T Wireless Servs.*, 215 Fed. Appx. 616, 621 (9th Cir. 2006) (affirming exclusion of expert report disclosed on the last day of discovery because delay was not substantially justified); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996); *United States v. Dunn*, No. 04-C-50472, 2007 U.S. Dist. LEXIS 27089, at *9-14 (N.D. Ill. Apr. 12, 2007) (holding that the testimony of witnesses improperly "sprung" on the plaintiff on the last day of fact discovery was barred from use at hearing or trial); *Schiller v. City of New York*, No. 04-Civ.-7921, 2007 U.S. Dist. LEXIS 16935, at *8-15 (S.D.N.Y. 2007) (concluding that supplementing initial disclosures three days before the end of discovery was untimely); *Spina v. Forest Pres.*, No. 98-C-1393, 2001 U.S.  Dist. LEXIS 19146, at *33-35 (N.D. Ill. 2001) (excluding testimony of witnesses disclosed on the last day of discovery).

Even prior to initial disclosures, counsel for Nordstrom sent several e-mails and had several conversations with Plaintiffs' counsel about alleged damages, and specifically offered to confer about "alleged damages suffered by your client as a direct result of the language on Nordstrom's website." [SUF No. 40; Shaw Dec. ¶ 2]. Nordstrom's counsel never received any satisfactory response, and still has not as of this filing. [SUF No. 40; Shaw Dec. ¶ 2 & ¶ 12, Exh. 16].

CALL &
JENSEN

After these preliminary conversations, on July 21, 2013, the parties submitted a Joint Rule 26 Report to the Court.  In the Joint Report, Plaintiff estimated its provable damages in the *hundreds of thousands of dollars*. [SUF No. 40; Shaw Dec. Exh. 1, Joint Report at 2:22-23] (emphasis added).  In that same report, Nordstrom stated that it offered to confer regarding Plaintiff's alleged damages, and Plaintiff responded that it would provide its computation of damages in its initial disclosures. [SUF No. 40; Shaw Dec. Exh. 1, Joint Report at 3:2-8].

Plaintiff tagTrends, Inc. served its initial disclosures on August 12, 2013, which Nordsdtrom received on August 14. [SUF No. 40; Shaw Dec. ¶ 4].  In these disclosures, Plaintiff admitted that it had "*not yet* calculated the amounts to which it is entitled because the calculation will rely, in substantial part, upon documents and information to be obtained from Nordstrom *and third parties in discovery*." [SUF No. 40; Shaw Dec. Exh. 3, Initial Disclosures at 4:24-26] (emphasis added).  Plaintiff alleged that Nordstrom's alleged false statement on its "supplier" website (*e.g.,* "formerly tagTrends") caused a diversion of Plaintiffs' customers from tagTrends to TT Global. [SUF Nos. 39-40; Shaw Dec. Exh. 3, Initial Disclosures at 5:9-10].  At that time, Plaintiff represented that it did not know which customers had been diverted, but stated it would supplement pursuant to Rule 26. [SUF No. 40; Shaw Dec. Exh. 3, Initial Disclosures at 5:11-13].  Notably, Plaintiff did not disclose the identity of any customers who were likely to have discoverable information regarding the supposed diversion of business pursuant to Rule 26(a)(1)(A)(i). [SUF Nos. 39-40; Shaw Dec. Exh. 3, Initial Disclosures at 2:7-26].

On August 28, 2013, the Court entered a scheduling order, setting a discovery cut-off date of May 19, 2014, motion cut-off of June 16, 2014, and trial date of August 11, 2014.  On this same date, Nordstrom's counsel sent a letter to Plaintiffs' counsel to confer regarding Plaintiff's insufficient disclosures. [SUF No. 40; Shaw Dec. ¶ 5, Exh. 4].  Nordstrom demanded that Plaintiffs identify specific customers who were allegedly diverted, and provide a computation of damages. [SUF No. 40; Shaw Dec. ¶ 5, Exh. 4].

On September 11, 2013, Plaintiffs' counsel responded to Nordstrom's letter and represented that Plaintiffs were unable to compute damages at that time, in part, because Plaintiffs would need to rely on evidence to be discovered in an action pending in the Superior Court of California. [SUF No. 40; Shaw Dec. ¶ 6, Exh. 5].  In the same letter, Plaintiffs stated that they did not know the identity of any customers who were diverted, but promised to supplement when they discovered the identity of customers who were allegedly diverted. [SUF Nos. 39-40; Shaw Dec. ¶ 6, Exh. 5].

On October 24, 2013, Nordstrom served written discovery to Plaintiffs. The interrogatories to tagTrends Asia and tagTrends, Inc. asked Plaintiffs to identify any instances of actual confusion resulting from Nordstrom's conduct (Interrogatory No. 5), to identify any consumers who were diverted to TT Global (Interrogatory No. 12), and to provide a calculation of any monetary damages suffered (Interrogatory Nos. 14, 16). [SUF No. 40; Shaw Dec. Exhs. 7, 8].  Interrogatories to Rob Hart also inquired into his damages (Interrogatory No. 9). [SUF No. 40; Shaw Dec. Exh. 6].  Moreover, Nordstrom served requests for admission seeking to establish that Plaintiffs suffered no actual damage as a result of Nordstrom's conduct. [Shaw Dec. Exhs. 9-11 (RFA No. 14 (tagTrends, Inc./tagTrends Asia), No. 7 (Hart)].

Plaintiffs responded to the written discovery on December 20, 2013.  [Shaw Dec. Exhs. 6-11].  Each of the Plaintiffs denied the request to admit that they had suffered no damages.  [Shaw Dec. Exh. 9, at 4:5-9 (Hart Response to RFA 7); Exh. 10, at 6:4-8 (tagTrends, Inc. Response to RFA 14); Exh. 11, at 6:4-8 (tagTrends Asia Response to RFA 14)].  However, Plaintiffs' responses to interrogatories did not identify any instances of actual confusion or consumer diversion, and did not offer any calculation of damages whatsoever.  [SUF Nos. 39-40; Shaw Dec. Exh. 6, at 4:18-5:3 (Hart Response to Interrogatory No. 9); Exh. 7, at 4:13-26, 5:12-24, 7:22-8:9, 8:23-9:10, 9:22-10:7 (tagTrends, Inc. Responses to Interrogatory Nos. 5, 7, 12, 14, 16); Exh. 8 at 4:1-14, 4:26-5:10, 7:6-20, 8:8-23, 9:9-22 (tagTrends Asia Responses to Interrogatory Nos. 5, 7, 12, 14, 16)].  Further, no supplemental discovery responses were served.

CALL & JENSEN

After many delays, Nordstrom finally took Plaintiffs' deposition on May 8, 2014. Rob Hart appeared on behalf of himself, tagTrends Asia, and tagTrends, Inc., and consistent with Plaintiffs Rule 26 disclosures, Hart could not provide any identification of lost customers or any computation of damages.   [SUF Nos. 39-40 (Hart Depo Transcript Exh. 13 at 119- 123; 148:6-24; 149:11-150:10)].   However, he did confirm that Nordstrom was a prior customer.   [SUF No. 5 (Hart Depo Transcript Exh. 13 at 157:3-22)].   As the customer, he confirmed that Nordstrom controlled the entire process for selecting suppliers, approving labels and tags, and instructing manufacturers to work with the approved suppliers. [SUF No. 5 (Hart Depo Transcript Exh. 13 at 33:20-34:19; 99:24-102:24;  135:18-25;  138:22-139:24;  140:24-141:3;  141:23-142:20;  146:12-23; 148:6-24; 149:11-150:10; 157:3-22)].

On May 19, 2014 (incidentally, the same day as the discovery cut-off), after a full opportunity to obtain documents and information from Nordstrom and third parties, Plaintiffs served supplemental disclosures. [SUF No. 40; Shaw Dec. Exh. 14]. Plaintiffs' supplemental disclosures stated *"on information and belief"* that Plaintiffs' damages exceeded *tens of millions of dollars*. [SUF No. 40; Shaw Dec. Exh. 14, at 3:9-11] (emphasis added).   However, even after increasing the damages from hundreds thousands to tens of millions without any new evidence or expert opinion, Plaintiffs still failed to include any computation of damages, and specifically admitted that they still had no computation of any category of damages.  Plaintiffs stated that their damages "will be quantified with precision by Plaintiffs when Plaintiffs obtain the financial records they have requested in connection with the referenced state court litigation." [SUF No. 40; Shaw Dec. Exh. 14, Supplemental Disclosures at 3:15-16].  Plaintiffs also stated that "[t]he documents provided by Defendant to date are *insufficient to enable these Plaintiffs to itemize their damages*." [SUF No. 40; Shaw Dec. Exh. 14, Supplemental Disclosures at 3:17-18] (emphasis added).   Plaintiffs again failed to identify a single customer who was allegedly diverted by any conduct of Nordstrom, or any witness who could competently testify regarding damages. [SUF No. 40; Shaw



Dec. Exh. 14].   Defendant's counsel promptly notified Plaintiffs' counsel that the supplemental disclosures failed to comply with Rule 26, were untimely, and were therefore defective. [Shaw Dec. Exh. 15].  To this date, Plaintiffs' counsel has still not responded to try and explain the untimely and defective disclosures, or to justify their failure to provide any evidence or competent testimony in support of damages.  [SUF No. 40; Shaw Dec. ¶ 12-13, Exh. 16].

In sum, Plaintiffs could not disclose any computation of damages at the outset of discovery, and they could not at the close of discovery. [SUF No. 40].  While Plaintiffs may take the position that they are still hoping to find evidence, the time for discovery and disclosure has passed and any "new" evidence submitted in opposition to this motion must be precluded.  Plaintiffs had ample time to obtain and disclose whatever evidence they intended to rely upon to prove their damages.  They have failed to do so.  Because Plaintiffs cannot obtain either injunctive relief or monetary relief, a trial on liability would be a waste of time and resources for both the court and the parties.  Summary Judgment must be granted.  *See Blau*, WL 5313967.

### 3.   Plaintiffs cannot recover profits

Plaintiffs' disclosures do not include any computation for recovery of Nordstrom's profits, so Plaintiffs cannot seek to recover them.  However, the failure to properly disclose a computation of "profits attributable" to the alleged infringement was probably not accidental.  Plaintiffs know that Nordstrom does not earn any profits from listing suppliers on Nordstrom's website, so Plaintiffs likely did not even attempt to meet their burden to prove profits "attributable to the infringement" as required by the Ninth Circuit.  *See* 9th Cir. Model Jury Instr. No. 15.26 (plaintiffs are only entitled to "profits earned by the defendant that are *attributable to the infringement*, which the plaintiff proves by a preponderance of the evidence") (emphasis added); *see also Rolex Watch, U.S.A., Inc., v. Michel Co.*, 179 F.3d 704, 712 (9th Cir.1999) (plaintiff carries



the burden to prove with "reasonable certainty: the defendant's gross sales from the infringing activity").[3]  Plaintiffs did not even try to meet their burden.

Moreover, as a pure legal matter, even if Plaintiffs' disclosures were not entirely deficient, Plaintiffs cannot recover any of Nordstrom's profits in this case.  *Blau*, WL 5313967 at *5 (recognizing the profits are only available if the parties are "in direct competition and [] Plaintiff suffered actual loss *due to Defendants' infringing sales*") (emphasis added).  Here, Plaintiffs and Nordstrom are clearly not competitors, and since Nordstrom does not make any sales through its supplier website, there are simply no profits at issue as a matter of law.  [SUF Nos. 37-38 and 40].

### 4.   Plaintiffs have no evidence of actual damages resulting from Nordstrom's conduct

With respect to actual damage, Plaintiffs' burden is to prove "both the fact and the amount of damage." *Lindy Pen Co., Inc.*, 982 F.2d at 1407. Plaintiffs cannot do so. In *Harper House, Inc. v. Thomas Nelson, Inc.*, the Ninth Circuit instructed that "[i]n a suit for damages under section 43(a) . . . actual evidence of some injury resulting from the deception is an essential element of the plaintiff's case." 889 F.2d 197, 210 (9th Cir. 1989); *see also Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 139 (2d Cir. 1991) ("When a plaintiff seeks money damages in [a] …case asserted under section 43(a), the plaintiff must introduce evidence of actual consumer confusion."). Here, Plaintiffs' initial disclosures did not identify any of Plaintiffs' former customers who visited Nordstrom's supplier website, or who claimed they were confused by the identification of TT Global as formerly tagTrends. [SUF No. 39].  Nordstrom also asked Plaintiffs in interrogatories to set forth any facts "that

---

[3]  The Supreme Court long ago confirmed these sound principles for recovery of profits in a trademark or unfair competition case:  "whether the recovery be based upon the theory of trademark, or upon that of unfair competition, the profits recoverable should be limited to such amount as may be shown *by direct and positive evidence to be the increment of defendant's income by reason of the infringement, and that the burden of proof is upon complainant to show what part of defendant's profits were attributable to the use of the infringing mark.* *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 260 (1916) (emphasis added).

1    establish the existence of any instances of actual confusion." [Shaw Dec. Exh. 7 at 4:13-
2    26 (Interrogatory No. 5 to tagTrends, Inc.)]. Plaintiffs responded that they could not
3    identify any instances of actual confusion. [Id.]. Plaintiffs have not supplemented their
4    responses to interrogatories. Nor have they offered any survey evidence or other expert
5    opinion that might show the fact or amount of some actual injury. Plaintiffs'
6    supplemental disclosures likewise fail to identify any evidence whatsoever of actual
7    confusion.

8         In short, it is clear that Plaintiffs have no evidence to support a claim for actual
9    damage. Because Plaintiffs have not disclosed any evidence of actual injury resulting
10   from Nordstrom's alleged trademark violation/unfair competition, summary judgment
11   must be entered in favor of Nordstrom. *Blau*, WL 5313967.

12        **B.    There Is No Likelihood of Confusion**

13        As already explained, Plaintiffs cannot proceed to trial without evidence to
14   support a monetary remedy. However, even if Plaintiffs would have satisfied their
15   *disclosure* obligations with respect to damages (which they indisputably have not);
16   Plaintiffs cannot prove liability. In order to prevail on their trademark and unfair
17   competition claims, Plaintiffs must prove that the phrase, "TT Global (formerly
18   tagTrends)," as used on Nordstrom's supplier website was likely to cause customer
19   confusion. *See* 15 U.S.C. § 1125(a)(1). Plaintiffs failed to produce any evidence to
20   support any viable substantive claim against Nordstrom. As explained above, evidence
21   of confusion in this case is impossible, given the relationship between the parties
22   (supplier/customer), the dynamics (private non-commercial website), and because there
23   is no purchasing public decision (customer decision in deciding between one company's
24   goods/services and another's). Therefore, Nordstrom is entitled to summary judgment.

25        Because Plaintiffs' trademark claims and unfair competition claims are based on
26   the same alleged conduct, they require the same analysis. *Toho Co., Ltd. V. William*
27   *Morrow & Co., Inc.*, F.Supp.2d 1206, 1210 (C.D.Cal. 1998) ("When trademark and
28   unfair competition claims are based on the same infringing conduct, courts apply the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

same analysis to both claims.").  "The critical determination is whether an alleged trademark infringer's use of a mark creates a likelihood that the **_consuming public_** will be confused as to who makes what product."  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 1988) (emphasis added).  Furthermore, in order to determine whether there is a likelihood of confusion, the Court must first determine who makes up the "consuming public."   "Where the relevant buyer class is composed only of professionals or commercial buyers familiar with the field, they are usually knowledgeable enough to be less likely to be confused by trademarks that are similar." 4 McCarthy on Trademarks and Unfair Competition § 23:101 (4th ed.).  The Ninth Circuit employs the traditional eight-factor *Sleekcraft* test for infringement in cases of competing goods or services.  *See AMF Inc. v. Sleekcraft Boats*, 599 F. 2d 341, 348 (9th Cir. 1979) ("[w]hen the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected.").  However, this is far from a typical trademark case involving competing goods or services.  In this case, Plaintiffs admit there are no typical "consumers," and Plaintiffs instead claim that they can identify actual diverted third party customers in order to maintain viable claims.[4]

  After many months of discovery, Plaintiffs have failed to identify any former diverted third part customers who even had access to the supposedly confusing statement on Nordstrom's website.  As a matter of simple logic, a customer cannot be confused by a statement that he never hears or sees.  Plaintiffs' only allegation against Nordstrom is that it referred to TT Global as "formerly TagTrends" on the website, https://www.nordstromsupplier.com/NPG/productlabel.html.   This website is itself buried within the website for the "NPG Supplier Procedures Manual." [SUF NO.¶ 16-21].  And the website is specifically designed to be used by Nordstrom employees, and

---

[4] If the only alleged "diverted customer" is Nordstrom, then Plaintiffs can sue TT Global for damages.  A claim against Nordstrom for continuing to conduct business with TT Global is not actionable under any legal theory.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

CALL&
JENSEN

manufacturers of Nordstrom private label merchandise – not to target any other customers or anyone from the purchasing public. [SUF No. 23].  Other than Nordstrom, Plaintiffs failed to produce a single discovery response or piece of evidence that any of their customers (former, current, or prospective) ever accessed this out-of-the-way website, or were likely to have accessed it while the statement was there.

So who are the relevant customers? According to Plaintiffs' own Amended Complaint, tagTrends' customers are professional: "major clothing brands such as Abercrombie & Fitch, Quiksilver, Seven Jeans, Roxy, VF Corp, DC Shoes, Adriano Goldschmied, Under Armour, Burton, and Oakley." (Dct. 24, First Amended Complaint ¶ 16).  Plaintiffs offer no evidence that these "major clothing brands" are suppliers for the NPG's private label goods, which they clearly are not.  Thus, there is not even any *circumstantial* evidence that might support an inference that Plaintiffs' customers accessed Nordstrom's internal website.  And Plaintiffs have not disclosed any third party customer witnesses who could provide direct evidence that they visited the website and were confused by what they found.

Of course, because the website is not password protected, it is *possible* that someone other than a Nordstrom employee or manufacturer could get to the website if they knew how to find it and had a valid business reason to visit the website.  But "[l]ikelihood of confusion requires that confusion be probable, not simply a possibility." *Rodeo Collection Ltd. v. West Seventh*, 812 F.2d 1215 (9th Cir. 1987), *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)  There is not a single piece of evidence to suggest that it was probable that any potential customers of Plaintiffs even visited Nordstrom's "NPG Supplier Procedures Manual" website, let alone had a legitimate business/commercial reason to visit the site.  Thus, there is no evidence that customers ever had a "commercial" opportunity to be confused.

Finally, if anything, Nordstrom's identification of TT Global as "formerly TagTrends" would have *reduced confusion* among its own private label manufacturers. In this aspect, the case is highly similar to *Kassbaum v. Steppenwolf*, 236 F.3d 487 (9th

CALL & JENSEN

Cir. 2000).  In *Kassbaum*, a former member of the band Steppenwolf referred to himself in advertising his new band as "formerly of Steppenwolf." The Ninth Circuit held "that Kassbaum's references to himself in promotional materials as 'Formerly of Steppenwolf'…did not cause a likelihood of confusion." *Id.* at 492-93. The Court reasoned that "the phrase[] 'Formerly of,'…greatly reduce[d] the likelihood of confusion about the source of the band's music.  Additionally, the context of the historical references to Kassbaum's affiliation with Steppenwolf in…promotional materials further reduces any likelihood of confusion." *Id.* at 493.  The Court cited other cases where use of the term "formerly" in connection with a trademark did not create a likelihood of confusion.  *See Kingsmen v. K-Tel Int'l Ltd.*, 557 F.Supp. 178 (S.D.N.Y. 1983); *Playboy Enterprises, Inc. v. Welles*, 7 F.Supp.2d 1098 (S.D.Cal. 1998).

Likewise, Nordstrom's statement *reduced* confusion by notifying manufacturers that the company they had been doing business with since 2009—tagTrends Global—had changed its name to TT Global.  Whether or not tagTrends Global was the true successor of tagTrends Asia, the statement on the website served a legitimate purpose.

**C.  Plaintiffs Fail To State Any Claim Under The Lanham Act, Because Nordstrom's Website Identifying TT Global As "Formerly tagTrends" Is Not A "Use In Commerce," And Even If It *Could Be* A "Use In Commerce" There Is No Admissible Evidence Of Likelihood Of Confusion.**

In rejecting Defendant's "use in commerce" at the pleading stage, the Court seemed to assume that Nordstrom's private label *manufacturers* may, in theory, also be considered "customers" engaged in "purchasing decisions" by selecting a supplier from Nordstrom's website.  Although a fair assumption at the pleading stage, the evidence obtained through discovery and confirmed by Plaintiffs is that Nordstrom's *manufacturers* do not make purchasing decisions; they do not select suppliers.  [SUF Nos. 2-6, 22, and 37-39].  Instead, *Nordstrom is the customer* and Nordstrom selects the supplier, and then later instructs the manufacturer(s) to use the pre-approved supplier.



1  Thus, Nordstrom makes all purchasing decisions; the *manufacturers* do not make these

2  decisions and therefore are not relevant customers under the Lanham Act.

3      It is black letter law that "trademark infringement law prevents only unauthorized

4  *uses of a trademark in connection with a commercial transaction* in which the

5  trademark is being used to confuse potential customers."  *Bosley Med. Inst., Inc. v.*

6  *Kremer*, 403 F. 3d 672, 676 (9th Cir. 2005) (emphasis added); *see also Century 21 Real*

7  *Estate Corp. v. Sandlin*, 846 F. 2d 1175, 1178 (9th Cir. 1988) ("The 'ultimate test' for

8  unfair competition is exactly the same as for trademark infringement.").  Unless

9  Nordstrom used Plaintiffs' alleged trademark "in a manner that affects potential

10  purchasing decisions-whether for goods or services," Plaintiffs' Lanham Act claims

11  must be dismissed.  *See Hancock Park Homeowners Ass'n Est. 1948 v. Hancock Park*

12  *Home Owners Ass'n*, 2006 WL 4532986 at *4 (C.D. Cal. 2006).

13      The undisputed evidence establishes that Nordstrom's website is not used in

14  connection with any commercial transactions where purchasing decisions are being

15  made.  To the extent that Plaintiffs contend otherwise, they have not produced any

16  admissible evidence to support an allegation that other third party customers or

17  manufacturers engage in purchasing decisions based on Nordstrom's website.  Any

18  potential third party customer transaction theory would be purely speculative.  For

19  example, Plaintiffs have not introduced any evidence to prove that anyone would be

20  confused about a single statement on Nordstrom's supplier website.  The statement on

21  the website by itself is immaterial without evidence of causation—*i.e.,* that some

22  relevant "customer" would have been influenced in a purchasing decision by relying on

23  the statement on Nordstrom's website.  *Who are these alleged "customers"?*  Plaintiffs

24  have not identified any customers in their disclosures, and they have not even identified

25  a witness (*e.g.,* an expert) who can testify regarding relevant customer confusion.

26      Finally, to the extent that Plaintiffs attempt to claim that the Nordstrom website

27  caused confusion and loss of business with manufacturers, all of those manufacturers

28  are overseas factories.  [SUF Nos. 5 & 6 (Hart Depo at 104:16-20; 105:16-25; 150:2-

CALL &
JENSEN

10].  The Lanham Act does not apply extraterritorially unless there is some effect on American foreign commerce, the effect is great enough to present a "cognizable injury" to Plaintiffs, and the interests of and links to American foreign commerce are great enough to justify an assertion of extraterritorial authority.  *See Star–Kist Foods, Inc. v. P.J. Rhodes & Co.,* 769 F.2d 1393, 1395 (9th Cir.1985) (holding that "the district court acted in accordance with principles of international comity and fairness in excluding wholly foreign commerce from the Lanham Act case before it.").  Here, Plaintiffs admittedly only engaged in a commercial transaction with factories (manufacturers) overseas, Plaintiffs have not identified any "cognizable injury" in the United States based on Nordstrom's conduct with manufacturers overseas, and a foreign lawsuit is already pending between the real parties in interest so there is no American foreign commerce interest great enough to justify interfering with a foreign lawsuit.

> **D.    Plaintiffs Fail To State A Claim For Violation Of California's False Advertising Law**

California's false advertising law ("FAL"), California Business & Professions Code §17500, makes it unlawful for a business:

> with intent directly or indirectly to induce the public to enter into any obligation relating [to disposal of personal property or performance of services], to make or disseminate . . . any statement, concerning that . . . personal property or those services, . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care would be known, to be untrue or misleading.

Plaintiffs have no evidence that Nordstrom engaged in false advertising.

Summary judgment is proper in this case simply because Nordstrom's statement on its supplier website is not an advertisement within the meaning of section 17500. "Speech in advertising format . . . is speech about a product or service by a person who is offering that product or service at a price, directed to persons who may want, and be willing to pay for, that product or service." *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 960-61

CALL&
JENSEN

(Cal. 2002). Moreover, to be an advertisement the statement must consist of "representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." *Id.*

Here, Nordstrom does not sell or promote any products on its supplier website. [SUF No. 38]. The target audience is Nordstrom's own employees and agents who may need information to complete the manufacture of products. [SUF No. 23]. There is nothing about the information on that website that even remotely suggests any intent "to induce the public to enter into any obligation relating to" disposal of personal property or performance of services. Even if it is not true that TT Global was "formerly tagTrends," the FAL simply does not apply.

Even if it did, there is no evidence that Nordstrom knew that the statement was untrue or misleading. Instead, the undisputed evidence establishes that Nordstrom believed in good faith that TT Global was in fact "formerly TagTrends." [SUF No. 15].

Plaintiffs cannot prove that Nordstrom should have known that the statement was untrue or misleading. At the time the statement was placed on the website, Nordstrom had been informed by TT Global staff that there had simply been a name change. [SUF No. 12]. Plaintiffs' attorney sent a letter in June 2012, but that letter did not reference the website. [SUF No. 30]. At most, it gave Nordstrom notice that some third parties were engaged in some kind of dispute which Nordstrom had no reason to get involved in. In view of the information available to Nordstrom at the time, Nordstrom was not in a position to determine that the phrase "formerly tagTrends" was untrue even after receiving the June 2012 letter.

In sum, even if TT Global is *not* formerly tagTrends, Plaintiff cannot prevail on its claim against Nordstrom for violation of the FAL. Nordstrom is entitled to summary judgment.

**E.    Plaintiffs State No Claim For Conspiracy Or Aiding And Abetting**

Plaintiffs accuse Nordstrom of conspiring with TT Global to steal Plaintiffs' business, and in aiding and abetting such theft. These claims are without any evidentiary support.

**1.    Aiding and Abetting (Claims 6 and 7)**

A defendant may be liable for aiding and abetting the commission of an intentional tort if he (1) knows of the breaching conduct and gives substantial assistance or encouragement to the primary actor; or (2) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person. *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App.4th 1138, 1144 (2005). Plaintiffs cannot establish a *prima facie* case under either theory.

The only fact Plaintiffs allege in support of their aiding and abetting theory is that Nordstrom did not cease doing business with TT Global after Plaintiffs' attorneys sent them a letter in June 2012 notifying them of a dispute between Plaintiffs and TT Global. Plaintiffs have no evidence that anyone at Nordstrom knew that TT Global, Joe Chan, or Robert Redding had stolen Plaintiffs' business. Nordstrom was not required to take Plaintiffs' attorney at his word that TT Global and tagTrends Global were rogue operations, particularly in light of the fact that Nordstrom had been doing business with TagTrends Global and TT Global without any objection since April 2009—more than three years.

There is also no evidence that Nordstrom helped Chan and/or Redding engage in such nefarious schemes as stealing Plaintiffs' trade secrets, raiding Plaintiffs' employees, or stealing Plaintiffs' furniture.   The evidence establishes only that Nordstrom was a third party bystander who decided not to interrupt an arm's length business relationship based only on accusations. Nordstrom cannot be charged with knowing which of the two warring sides was in the right, and which was in the wrong. In the meantime, Nordstrom had need of a competent label and tag supplier, and TT

- 24 -

CALL& JENSEN

1   Global was able to continue providing the service. Refusing to jettison TT Global as an

2   approved supplier does not make Nordstrom liable for TT Global's conduct.

3         This Court previously recognized that if all Plaintiffs could prove was that

4   Nordstrom "did not take down its description of TT Global as 'formerly tagTrends'

5   after receiving the letter generally describing Plaintiff and TT Global's conflict. (See

6   Compl. ¶¶ 23–25.)," that Plaintiffs' claims would fail. [Dct. 21, Order Dismissing

7   Complaint at 10]. Now, after a full opportunity for discovery, Plaintiffs still have no

8   evidence that Nordstrom aided or abetted any tortious conduct. All they can prove is

9   that Nordstrom did not take down its description of TT Global as "formerly tagTrends"

10   until it was brought to Nordstrom's attention, and that Nordstrom has not removed TT

11   Global as an approved supplier. Accordingly, Nordstrom is entitled to summary

12   judgment on Plaintiffs' claims for aiding and abetting.

13           **2.    Civil Conspiracy**

14         The elements of civil conspiracy under California law are the formation and

15   operation of the conspiracy, wrongful acts or acts done pursuant thereto, and damage.

16   *See Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal. App. 4th 1022, 1048 (1998). As

17   with their aiding and abetting claims, Plaintiffs cannot establish a *prima facie* case of

18   conspiracy.

19         Plaintiffs have no evidence that Nordstrom did anything more than keep TT

20   Global as an approved product label, hangtag, and packaging supplier. [SUF NO. 43].

21   As a matter of law, this fact is not sufficient to establish the formation of a conspiracy

22   or any wrongful act.

23   **V.    CONCLUSION**

24         For the foregoing reasons, Nordstrom is entitled to summary judgment as to each

25   of Plaintiffs' claims.

26   Dated: June 16, 2014         CALL & JENSEN
                               A Professional Corporation

27                                  By:  */s/Scott P. Shaw*
                                  Scott P. Shaw

28                                  Attorneys for Defendant Nordstrom, Inc.

CALL & JENSEN

NOR04-12:1332581_7:6-16-14         - 25 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT NORDSTROM, INC.'S
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION